THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JUAN COLÓN MORALES, Defendant and Appellant.

No. CR-70-52.      Decided June 11, 1971.

---

*Enrique Miranda Merced* for defendant. *Gilberto Gierbolini, Solicitor General,* and *Candita R. Orlandi, Assistant Solicitor General,* for The People.

MR. JUSTICE TORRES RIGUAL delivered the opinion of the Court.

Appellant was convicted of murdering his wife and son. Pursuant to Rule 74 of the Rules of Criminal Procedure he raised the defense of insanity. In one case he was sentenced to life imprisonment and in the other he was sentenced to serve from 15 to 20 years in the penitentiary.[1] On appeal he assigns as errors that the prosecuting attorney did not comply with his obligation to establish defendant's mental soundness beyond reasonable doubt and that the court erred in charging the jury on the defense of insanity.

The following appears from the record: The facts were committed on July 25, 1967. On June 4 and on August 6, 1968 appellant was found not fit to stand trial. At the request of the prosecuting attorney, on October 4 the court ordered that the defendant be released from jail, since he had been imprisoned for more than a year without it having been possible to hold the trial as a result of his condition and ordered that he be committed to the Psychiatry Hospital in Ponce. Subsequently, in April 1969, after a hearing on appellant's condition, the court concluded that he was mentally qualified to stand trial and proceeded to set the cases for hearing.

The evidence presented showed that appellant lived with

---

[1] He was also convicted and sentenced for a violation of the Weapons Law.

his wife and children in the ward Coto Laurel of Ponce. The night of the events after dinner, appellant asked one of his daughters to fetch his wife, who was visiting at the house of his son Héctor Luis. When the wife came up he started to give her blows with a machete. When his son Héctor Luis intervened, he also attacked him causing the death of both of them, without any argument whatsoever. The autopsy of the deceased Antonia Ortiz revealed multiple incised wounds from two to nine inches long and that of the body of the deceased Héctor Luis Colón revealed about 25 deep incised wounds and evisceration of the intestine. One of appellant's daughters testified that appellant was calm, that he was happy and laughing when he committed the offenses. When questioned whether appellant was angry, she answered: "On the contrary, he was laughing." (Tr. Ev. pp. 72–73.)

Witness *Jacobo Albizu Guzmán*, appellant's neighbor, testified that he knew appellant as a serious and reliable man. He also testified that:

"About the end of the year, or early in nineteen sixty-seven the man was unbalanced, I don't know if something was the matter with him or if he had anything, a man whose actions were unusual, to the extreme that he made a small transaction with me concerning a bull he had, he sold it to me and did not want to charge anything for it and two weeks later he went to my house and I had to return the bull to him." (Tr. Ev. pp. 121A–122A.)

Another witness, *Juan Santos García*, testified that at the time of the events appellant was insane.

"Tell me something, on the days more or less, on the months prior to July 25, 1967, did you notice any change in Don Juan's conduct?
Well yes, I knew he was insane.
Mr. García:
Why do you say he was insane?
Witness:
Because I worked with him.

Did you work with him?

Yes, when his manner of giving orders to me changed I noticed he was insane.

What did he do?

He gave me orders and told me that some people were watching him.

What did you say to that?

I don't know, because I didn't see anybody.

Didn't he tell you where those people were?

Under a sewer, next to him.

And you went to look?

Yes, and I didn't see anybody.

Did you tell him that there was nobody there?

Sure.

And what did he do, what did he tell you?

He told me that he was there and since I didn't see anybody I told him there was nobody there.

Mr. García:

And you say that you have known him for about twenty years?

Witness:

About twenty-five.

How long have you been working together?

About 17 years.

And that conduct of his which you say that he said he was being persecuted, that the people were under the sewer, was that situation repeated or did it happen only once?

About five or six months before.

How many times did he express himself thus?

Many times." (Tr. Ev. pp. 129A–131A.)

Another witness, *Manuel Bonilla Santiago*, testified:

"I know he has been a good man, a humble man, a working man, and about four or five months before the events I would say he was talking nonsense.

What did he say?

He said he was being watched.

Did he tell you that?

Yes, that there were people in the sewer and I looked and I didn't find anybody." (Tr. Ev. p. 148.)

There are other testimonies which describe abnormal aspects of appellant's conduct at the time of the events.[2] All the witnesses describe defendant as a hardworking, honest, and good man.

The psychiatrist, Dr. Juan Marino Román, examined appellant 10 months after the events and concluded that he was not fit to stand trial. The psychiatric evaluation showed that appellant was suffering from a schizophrenic reaction. On February 17, 1969, more than a year and a half after the offenses were committed, a new evaluation of appellant was made and he was found to have a partial remission of symptoms.

In *People* v. *Alsina,* 79 P.R.R. 44 (1956), we stated that by considerations of public policy the law presumes that any person charged with an offense is in his sound mind when he is committing the crime. This presumption of sound mind relieves the prosecuting attorney of having to prove defendant's mental capacity. However, said presumption may be controverted. In the case at bar, it was effectively controverted, as we have seen, with the testimony of several witnesses in regard to the abnormal conduct of defendant at about the time of the events and by the defendant's daughter's own recital concerning appellant's attitude when he committed the offenses charged—happy, not angry, and laughing. The presumption having been thus controverted by appellant, the burden of proof concerning the fact of defendant's sanity fell upon the prosecuting attorney, and he had to establish such fact like any other fact, beyond reasonable doubt. The position of the Solicitor General in his report to the effect that the evidence presented by appellant was not sufficient to controvert the presumption of soundness of mind is untenable. Appellant effectively overcame the presumption.

---

[2] See the testimonies of Andrés Almodóvar: ". . . lately what I told him was, 'I cannot pay attention to you' and I had to leave because he spoke nonsense and all that." (Tr. Ev. p. 138A.) See also. the testimony of Flor Aguirre Collazo. (Tr. Ev. p. 144.)

The Solicitor General argues that the prosecuting attorney presented abundant evidence to establish appellant's sanity at the moment of committing the offense. We have carefully examined the record and we do not agree. The evidence which appears from the record in that respect consists of the vague statement of witness Gladys Colón Cruz, appellant's daughter, to the effect that she did not notice anything abnormal in regard to her father, and that the latter had never been committed to an institution for insane persons. (Tr. Ev. pp. 62 and 63.) However, the manner in which this same witness describes her father's behavior when the events took place—happy, not angry, laughing—is not that of a normal person. Also witness Norma Iris Cruz Aguirre, defendant's daughter-in-law, testified to questions of the prosecuting attorney on whether she had noticed something strange in regard to appellant's behavior, that she had not. (Tr. Ev. p. 86.) But also on the cross-examination she testified that she never had had long conversations with appellant, that she only greeted him when they met and that she could not say anything in regard to appellant's condition.

The other witness presented by the prosecuting attorney concerning this point was José M. Rivera, who to the questions of the prosecuting attorney on whether he had noticed anything abnormal in appellant's conduct answered: "No, sir." (Tr. Ev. p. 124.) On cross-examination this same witness testified that he did not know appellant well, that he did not know where appellant worked, and that he had never spoken to him. (Tr. Ev. p. 134.)

Said evidence is clearly insufficient to establish appellant's mental sanity beyond reasonable doubt, reason why the judgment of conviction cannot prevail.

Appellant's acquittal on the ground of insanity does not mean that he shall be released immediately. Two innocent human beings linked with appellant through ties of blood and affection have already died in his hands. It is evident that

his mental sickness may constitute a serious risk for the community. That is why in reversing the judgment appealed from appellant will remain committed under the custody of the warden and the trial court will comply with Rule 241 of the Rules of Criminal Procedure.[3]

Mr. Chief Justice Negrón Fernández did not participate herein.

---

[3] Said Rule provides:

"If the jury acquits the defendant on grounds of insanity, and the court has a reasonable basis for believing that the defendant at that time is still of unsound mind, it shall commence the proceedings to make the corresponding determination, following the procedure provided in Rule 240. The court may order that the defendant remain under the custody of the warden until the end of the proceeding. If the court finds that the defendant is mentally incompetent, it shall order him to be committed to an adequate institution until he becomes sane, and if it finds the contrary, it shall order his release."